In the Matter of the Arbitration between Carborundum Company, Petitioner, and Martin Wagner, as President of United Chemical Workers, C. I. O., et al., Respondents.

Supreme Court, Special Term, Niagara County, April 3, 1950.

*Clarence Runals* for petitioner.

*Salem Mansour* for respondents.

VANDERMEULEN, J.  For many years prior to the commencement of this proceeding the petitioner owned, maintained and operated and now owns, maintains and operates an industrial plant consisting of several buildings and equipment for the manufacture of abrasive and refractory products situated on Buffalo Avenue in the city of Niagara Falls, New York.  One of such buildings is designated as building 14 and another building 32.

In these buildings were manufactured carborundum wheels and aloxite wheels.  Chemically the synthetic abrasive known as '' carborundum '' is silicon carbide; that of '' aloxite '' fused aluminum oxide.  Both are abrasives and products of the electrical furnace.  The process of manufacturing both brands of wheels is the same.

Both aloxite and carborundum wheels are subjected to a process known as firing in kilns.  At Building 32 the firing of most wheels is conducted in tunnel kilns which enables the process to be accomplished in between seven to eight days, depending upon the size of the wheels.  At Building 14 the firing of all wheels was conducted in so-called "round kilns ", an older process which requires a period of from fourteen to twenty-five days to accomplish a result which could be obtained in tunnel kilns in approximately half the time.  The company decided to manufacture both aloxite and carborundum wheels in Building 32.

The company further claims that the manufacture of both aloxite and carborundum wheels in Building 32, in addition to the efficiencies hereinabove alleged, permits of the more efficient utilization of machinery and equipment, avoids duplication of costly equipment, eliminates unnecessary transportation of materials and finished products, reduces the cost of supervision and decreases the time within which orders for abrasive wheels may be filled.

On July 19, 1948, a collective bargaining agreement was executed between the company, the national union and the local union, herein referred to as the '' Collective Bargaining Agreement '', covering rates of pay, wages, hours of employment and other conditions of employment as therein set forth for all employees of the company paid on an hourly or incentive basis

in the plants of the company in the city of Niagara Falls, New York, except watchmen, guards and supervisory employees.

The unions filed twelve grievances with the company arising out of the new practice of manufacturing aloxite wheels and carborundum wheels in building 32. In view of the length of the phraseology of these grievances reference is made to a list of them attached to the respondents' answer, together with communications and replies of the company to said grievances, in some instances in the nature of an explanation. They are numbered " A " to " L " inclusive. The following, however, is one of the grievances, the remaining being quite similar:

" *Grievance 733-G* was filed August 19th, 1949. Prior to the transfer of certain Carborundum mixing operations to the same building where Aloxite operations were carried on, each mixing operation was serviced by separate workers called ' service men ', the Carborundum wheel mix service man being a member of the Carborundum departmental seniority unit, and the Aloxite wheel mix service man being a member of the Aloxite departmental seniority unit. The Union's complaint was that the Company assigned the Aloxite mix service man to service Carborundum mix workers as well, thereby combining two jobs in one and thereby giving to the Aloxite mix service man work which belonged in the Carborundum departmental seniority unit. It was the Union's position that having a worker of one departmental seniority unit do work that belonged to a member of another departmental seniority unit constituted a direct violation of the Contract provisions relating to seniority and job classification. "

The unions claim that the question arising out of the grievances is whether under the terms of the provisions of the Collective Bargaining Agreement of 1948, the company has a right, in the course of regular operations to have the available work of one departmental seniority unit performed and done by employees of another seniority unit who have no seniority standing in the department in which the work is done and that this is a matter for arbitration. The company claims that the matters as to which arbitration is sought pertain to interchanges of work in the manufacture of aloxite and carborundum brand wheels between the employees in the aloxite wheel department and carborundum department of the company and presents the question common to all alleged grievances filed whether the company agreed that all the work pertaining to the manufacture of aloxite wheels shall be performed only by employees in the aloxite

wheel department and that all work pertaining to the manufacture of carborundum wheels shall be performed only by employees in the carborundum department.

In accordance with the procedure prescribed in the Collective Bargaining Agreement representatives of the company's executives discussed the grievances with representatives of the national union and the local union. By letter dated November 1, 1949, the director of industrial relations of the company notified the local union that since there was no question of interpretation or application of the Collective Bargaining Agreement, the questions posed at such conferences were not proper subjects for grievances under the Collective Bargaining Agreement and that the said alleged grievances were therefore rejected by the company. Whereupon the respondents served notice of intention to conduct an arbitration of the alleged grievances. The company seeks a final order staying the arbitration and all proceedings therein.

Judge POUND in *Matter of Lehman* v. *Ostrovsky* (264 N. Y. 130, 132) said: '' No one is under a duty to resort to arbitration unless by clear language he has so agreed. '' Whether or not a bona fide dispute exists is a question of law for the court to decide. See, also, *Matter of Wenger & Co.* v. *Propper Silk Hosiery Mills* (239 N. Y. 199, 202–203), and *Matter of General Elec. Co.* (*United Elec. Radio Machine Workers of America, C. I. O.*) (300 N. Y. 262).

In *Matter of Int. Assn. of Machinists* (*Cutler-Hammer, Inc.*) (271 App. Div. 917, affd. 297 N. Y. 519) the court in holding that the matter in question was not the subject of arbitration, said at page 918: '' While the contract provides for arbitration of disputes as to the ' meaning, performance, nonperformance or application ' of its provisions, the mere assertion by a party of a meaning of a provision which is clearly contrary to the plain meaning of the words cannot make an arbitrable issue. It is for the court to determine whether the contract contains a provision for arbitration of the dispute tendered, and in the exercise of that jurisdiction the court must determine whether there is such a dispute. ''

The sections of the agreement primarily involved in this proceeding are: 13, 98, 105, 122 to 126 inclusive. Section 13 provides: '' The Management of the business of the Employer and the direction of its personnel, including the right to hire, discharge and discipline for proper cause and subject to the terms of this contract are the exclusive responsibility of the Employer. The Employer shall be the exclusive judge of all matters per-

taining to the products to be manufactured, the location of plants, the schedules of production and the methods, processes, means, and material to be used. ''

Section 98 provides, among other things: '' In curtailments of operations the Employer *so far as practicable* will in general spread available work among equally qualified employees in a seniority unit before laying off employees in that unit.'' (Italics mine.)

Section 105 provides: '' For the purpose of lay-off and re-employment after lay-off and of transfer and promotion to work classifications covered by this Agreement the following plant work groups will constitute separate departmental seniority units which have been grouped within the several divisions. ''

Then follows the job descriptions of the aloxite wheel department and the carborundum department.

Sections 122 to 126 define a grievance and the procedure to be followed in connection therewith.

Both parties must have recognized that circumstances would arise where the company could not adhere strictly to the line of all work in the carborundum department being done by carborundum employees only and all work in the aloxite department being done by aloxite employees only, else the words '' so far as practicable '' would not have been inserted in the section.

In *Matter of Berger* (*World Broadcasting System*) (191 Misc. 1043, affd. 274 App. Div. 788) the controversy arose by the discontinuance of the company of its wired music program department and the consequent termination of employment of those engaged in the operation of that department. The court said at page 1046: '' The union contends that the discontinuance of the programing department resulted in either a discharge or layoff, as these terms are used in sections XII and XIII of the collective bargaining agreement. In the view of the court, however, the limitation on the employer's right to discharge and to lay off employees was not intended to curtail the employer's right, in the exercise of good faith of its business judgment to discontinue a department or otherwise make a radical change in the method of its business operations. The purpose of the clauses invoked by the union was rather to prevent unjustified or discriminatory discharges under color of justifiable cause and, in the case of layoffs, to preserve seniority rights in the plant. '' (See, also, *Matter of Curry, Inc.* [*Reddeck*] 194 Misc. 527.)

There is nothing in the agreement that would have prevented or could prevent the company from abolishing either the carbo-

rundum department or the aloxite department nor to prevent the combining of them into one department. There is nothing in the agreement to prevent interchanges of work between the departments. Moreover, section 93 provides for a transfer into another seniority unit when work ceases to be available in the regular seniority unit. It is conceded that the job numbers, the job titles and the job descriptions of the employees in the aloxite department and the carborundum department involved in the alleged grievances are unchanged, being substantially the same in both departments. Their classifications are therefore not disturbed. By not exercising its power to abolish either department or combining the departments, and by resorting to interchanges of work when necessary or practicable, the company in good faith has endeavored to preserve and protect the rights of the men in both departments under departmental seniority.

The Carborundum Company is engaged in a highly competitive business and on the ability and skill of the management depends its ability to compete and keep its plant at a point of full employment, which is vital to all the employees. The union must have recognized this, else it would not have consented to the section referring to the rights of management (§ 13) being put into the agreement.

Submit final order staying the said arbitration between the Carborundum Company and United Chemical Workers C. I. O. and United Chemical Workers, Local 12058, and all proceedings therein.